IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

LINDA SCHULTZ,

                          Plaintiff,                          OPINION AND ORDER

      v.

DEPARTMENT OF WORKFORCE DEVELOPMENT,                          09-cv-274-slc

                          Defendant.

---

This is a civil suit for money damages brought by plaintiff Linda Schultz against her former employer, the Department of Workforce Development.  Plaintiff contends that while she was employed by the Department, she was paid less than men who were performing work equal to hers in terms of skill, effort and responsibility, in violation of the Equal Pay Act, 29 U.S.C. § 206(d).  Before the court are defendant's motion for summary judgment, *see* dkt. 45, and plaintiff's motion to amend her amended complaint to add her successor, Nelse Grundvig, as a comparator, *see* dkt. 77.  Grundvig was hired in early June 2010.

I am granting defendant's motion for summary judgment with respect to all of plaintiff's comparators except Grundvig.  Plaintiff's equal pay claim is untimely with respect to Paul Saeman and Terry Ludeman, who left the Department more than 3 years before plaintiff filed her complaint.  With respect to Dennis Winters and Michael Soref, plaintiff has failed to meet her burden of showing that the work they performed was equal to hers in terms of skill, effort and responsibility.  Even if plaintiff could meet this burden, she has failed to adduce evidence sufficient to raise a genuine dispute regarding the Department's affirmative defenses to the wage disparity.

As for Grundvig, I am granting plaintiff's motion to amend her complaint.  Although the Seventh Circuit's decision in *Wernsing v. Illinois Dept. of Human Services*, 427 F.3d 466 (7th Cir. 2005), contains strong language suggesting that an employer who matches an employee's prior wages (as the Department did with respect to Grundvig) cannot be liable under the Equal Pay Act for any resulting pay disparity, I am not convinced that prior wages alone is enough in this case, where Grundvig was an outside hire whose initial *offer* from the Department was below his prior wages but still far more than Schultz had been making.  Accordingly, allowing amendment would not be futile.  However, to alleviate any prejudice to defendant from allowing amendment at this late juncture, I am striking the trial date and permitting defendant to file an amended motion for summary judgment with respect to Grundvig.

A few preliminary remarks about the facts:  In many instances, plaintiff responded to facts proposed by the Department by reciting at length from her own affidavit, at times going on for pages.  I share Judge Crabb's view that such rambling responses are not countenanced by the *Procedure to be Followed on Motions for Summary Judgment,* as they unduly complicate the court's task in deciding summary judgment motions.  Plaintiff further roils the waters because these responses, despite their length, often fail to respond directly to the fact proposed by defendant.  Accordingly, in determining the undisputed facts, I have deemed as undisputed those facts to which plaintiff failed to respond directly or properly.  Against this backdrop, I find the following facts to be undisputed for the purpose of deciding the motion for summary judgment:

FACTS

**I. Plaintiff Linda Schultz**

Plaintiff Linda Schultz worked for the Department of Workforce Development, an agency of the State of Wisconsin, from 1971 until she resigned at the end of 2008. Roberta Gassman has been the Secretary of the Department since January 2003. The Department is divided into divisions, which are subdivided into bureaus, which in turn are subdivided into sections. For her entire career, Schultz has worked in the Department's Labor Management Information Data Development (LMI) Section, within the Bureau of Workforce Training, within the Division of Employment and Training.[1] Work performed and programs managed by the LMI Section differ from that performed by other sections within the bureau.

Throughout her career, Schultz has been a member of Wisconsin's classified civil service. Under Wisconsin civil service law, each position in the classified civil service system is allocated to the appropriate class on the basis of its duties, authority, responsibilities and other factors recognized in the job evaluation process. A "classification" is the category to which a job is assigned. The schedule and pay range for a specific classification define the minimum and maximum pay rates for positions in that classification. A "position description" more narrowly defines the specific set of duties and responsibilities and other characteristics that apply to a particular position within a given classification. There can be many different position descriptions within a classification.

In 1971 Schultz began her career in the Department as a Clerical Assistant 2. Schultz completed high school and took some college courses but never obtained a college degree. After

---

[1] The division has had different names during Schultz's tenure as chief of the LMI Section, including the Division of Workforce Excellence and the Division of Workforce Solutions.

holding various positions over several years with the Department, Schultz was promoted on April 15, 1996 from the classification of Research Analyst 5 to Research Analyst 7 Supervisor. In accordance with Wisconsin's compensation plan for civil service employees, upon promotion her hourly pay increased from $16.359 an hour to $18.083 an hour, a 10.5% increase. On June 1, 1997, Schultz's position was reclassified from Research Analyst 7 Supervisor to Research Analyst 8 Supervisor to reflect a change in duties and responsibilities. Schultz's pay increased from $20.575 to $21.280 an hour.

On November 21, 1999, Schultz's position was changed from "Research Analyst 8 Supervisor" to the classification of "Research Administrator." This was a change in classification name only with no corresponding salary change.

From approximately 1997 until her resignation in December 2008, Schultz held the position of Chief of the Labor Market Information section. In that position, Schultz was responsible for the organization and direction of the LMI section. Schultz supervised 11 clinical staff and six professional staff, she worked with the United States Department of Labor regarding certain programs managed by her section, and she reported to the Bureau Director. Apart from occasional meetings at which other employees were present, Schultz had limited contact with Secretary Gassman.

Schultz's section managed the Bureau of Labor Standards' federal-state cooperative programs and other data collection activities. The federal-state cooperative programs under Schultz's supervision were the Quarterly Census of Employment and Wages, Local Area Unemployment Statistics, Mass Layoff Statistics, Current Employment Statistics and Occupational Employment Statistics wage programs. Employees under Schultz's supervision

4

assembled a variety of reports, analyses and surveys to meet the expectations of the federal government with respect to these programs and to provide data that was required by the Department. Much of the work done by Schultz's section was prescriptive and routine. For example, one of Schultz's responsibilities was to supervise the quarterly census of employment ages, a function defined by the Bureau of Labor Statistics with stringent guidelines on how that should be done. Schultz also supervised a nurse wage survey that was limited in duration. In addition to supervising the data collection activities for the department, Schultz also directed original research, analyzed contracts, produced reports used to monitor agency performance and responded to data requests from the Secretary, Governor and state legislature.

Schultz supervised a unit that provided information to the Projections Unit. The Projections Unit is part of the Office of Economic Advisors, an office located within the Office of the Secretary and not managed or supervised by Schultz. The Projections Unit took the data provided by Schultz's unit, analyzed it and published projections of the likely numbers of openings for a given occupation.

In 1996, Schultz began working part-time as a receptionist at Epic Systems, Inc., a private employer in Dane County, while retaining her job at the Department. Schultz left work at the Department at 3:15 p.m. every day in order to get to her job at Epic. Although Schultz's supervisor, Bureau Director Gary Denis, was aware of this, Gassman did not learn of Schultz's second job until after Schultz resigned from her position in the Department. Schultz cannot recall any situations that arose at the Department after she had left for Epic in which her absence posed a problem.

Effective March 12, 2000, the classification specifications for Research Administrator were modified to reflect the results of a broadbanding study conducted by Wisconsin's Office of State Employment Relations (OSER). OSER implemented "broadbanding," whereby various pay ranges were grouped together. This gave the state more flexibility in establishing pay rates within a position's pay range. For instance, broadbanding gave managers discretion to consider an employee's training and experience when setting pay rates rather than have the rate dictated by the position.

Sometime before December 2008, Schultz asked her supervisor, Bureau Director Gary Denis, to nominate her for a Discretionary Compensation Award, or DCA. Schultz submitted a self-drafted nomination form with her request. DCAs are lump sum cash payments or base salary increases available for non-represented employees that can be granted for reason of equity, retention or to compensate an employee for an extraordinary temporary workload. Denis responded that he could not in good faith pass along her nomination, not only because he felt much of the text was inflammatory and inappropriate, but also because the Governor had declared that there were to be no DCAs that year. After Denis refused to nominate her for a DCA, Schultz resigned from her position, effective December 30, 2008. At the time she resigned, Shultz was making approximately $66,000 a year.[2]

---

[2] In her brief, Schultz asserts that she made "repeated requests" for equity adjustments in her pay, Dkt. 53, p. 17. Apart from the evidence concerning the December 2008 DCA request, the only other admissible evidence showing that Schultz sought higher pay is the testimony of former HR Director William Komarek, who testified vaguely that he remembered talking to Schultz about her concern over not receiving some pay adjustments or a pay increase. Dkt. 57, exh. 11, at 23. It is unclear when this conversation occurred or whether Schultz had been seeking reclassification or a DCA. In any event, Komarek testified that he told Schultz that she should bring her complaint to her managers and he took no action on her behalf. *Id*. at 24. Komarek's testimony does not support an inference Schultz's superiors repeatedly "denied her request" for a pay raise.

On May 10, 2009, she filed this lawsuit, alleging that the Department had violated the Equal Pay Act, 29 U.S.C. § 206(d)(1), by paying her less than it paid male Research Administrators for work requiring substantially similar skill, effort and responsibilities.  On June 17, 2009, she filed an amended complaint providing the names of four males that she contends were paid more for equal work:  Dennis Winters, Michael Soref, Terry Ludeman and Paul Saeman.  On June 8, 2010, after briefing on summary judgment had ended, she moved to amend her complaint to add a fifth comparator, Nelse Grundvig.

## II.  Dennis Winters/Terry Ludeman

In February 2006, a vacancy occurred in the position of Chief, Office of Economic Advisors, a Research Administrator classification in the Department.  The person holding this position is considered to be the chief economist for the State of Wisconsin.  The Office of Economic Advisors is not a division within the Department, but rather is an office within the Office of the Secretary.  The Chief of the Office of Economic Advisors reports directly to the Department Secretary.  Before February 2006, the Chief had been Terry Ludeman.

The Department carried out a major national recruitment to fill Ludeman's position.  The job announcement listed the salary range between $49,076 and $78,629 annually, depending on qualifications.  In deciding on this salary range, the Department looked at what economists in the federal government were paid.  In 2005, economists employed by the federal government earned an average annual salary of $89,441.  As a current state employee in a Career Executive position, Schultz automatically would have been placed on the list of candidates to be interviewed for this position if she had applied for it.  Shultz did not apply.

7

Dennis Winters applied and was hired for the job. Winters has a bachelor's of science degree from the University of Wisconsin-Madison and a master's of science degree from Colorado State. He has authored or coauthored numerous publications pertaining to Wisconsin's economy and workforce development. He has held positions with Clayton Brokerage Company of St. Louis (research analysis), Massachusetts Executive Office of Energy Resources (senior policy analyst), Data Resources, Incorporated (petroleum analyst), the Institute of Gas Technology (education programs) and Warton Econometric Forecasting Associates (consultant and account vice-president). He also formed consulting firms, Real Economics and North Star Economics, where he did economic consulting, development and analysis for both the private sector and the government.

Secretary Gassman was familiar with Winters and his work and had heard him speak twice at conferences. She also was familiar with his consulting firm, North Star Economics, which had developed a good reputation for producing major studies on the Wisconsin economy. Winters was hired and began work on November 1, 2006.

Winters's starting salary was $38.410 per hour, approximately $79,900 annually. This was higher than Gassman's original offer but lower than Winters's request, which had been above the range for the position. In setting Winters's starting salary, Gassman reviewed his resumé and considered many factors, including his education, employment background, knowledge of economic issues, reputation as a highly regarded and very credible expert on the Wisconsin economy, his public profile and experience dealing with the public and the media and his work with Northstar.

As Chief of the Office of Economic Advisors, Winters is responsible for providing economic and labor trend information to key staff in the Department, the Governor's Office and other officials and for representing the Department to the public and other agencies. Winters manages a group of high-caliber analysts, most of whom are college educated and some of whom have graduate degrees, who review and analyze the dynamics of wage rates for particular occupations over time. The scope of information analyzed by Winters's staff is broad and deep. Much of the data analyzed by the Office of Economic Advisors is collected and banked by the LMI section. Winters and his staff take the data provided by LMI, analyze it, interpret it into the current state of economic affairs and then explain its findings to non-economists.

Winters frequently addresses the public on behalf of the Department, announcing labor market and economic information to the public. Winters often communicates directly with Secretary Gassman and needs to be available for consultation at a moment's notice, including nights and weekends.

### III. Michael Soref/Paul Saeman

Michael J. Soref held a position at the Department from May 16, 2004 until he left the Department June 21, 2008. Soref was Chief of the Research and Statistics Section, which was located within the same division and bureau in which Schultz worked. Like Schultz's position, Soref's position was classified as a "Research Administrator" position. Before Soref was appointed to the position, it had been held by Paul Saeman. Saeman's employment with the Department ended on June 8, 2004.

Soref holds a Ph.D. in sociology from the University of Wisconsin. He has authored or coauthored numerous publications covering subjects such as maternal and child health, the uninsured, day care, morbidity and managerial autonomy. Before joining the Department, Soref was an employee with the Wisconsin Department of Health and Family Services, where he held a non-supervisory position classified as a Research Analyst 7 position. His appointment as Chief of the Research and Statistics section was a promotion that entitled him to a base pay increase of not less than 8% of the pay range minimum, subject to the appointment maximum. Soref was appointed at a pay rate of $30.040 an hour, roughly $62,500 annually, which constituted a 14.4% increase over his previous pay rate.

As chief of the Research and Statistics section, Soref supervised one unit supervisor, 15 employees in professional classifications, 2 employees in technical classifications and 1 employee in an administrative support classification. The Research and Statistics section provides a full range of research and statistical service in the determination of federally mandated and essential state information requirements. The section is responsible for the design and maintenance of optimally effective and efficient reporting systems and research studies with emphasis on program issues and evaluation of new program initiatives, installation and operation of data systems, analysis interpretations and utilization of data and preparation of reports.

The primary program with which Soref's section worked was the Wisconsin Works, or W-2 program, which is Wisconsin's public assistance program for needy families. Soref directed original research and supervised research on the W-2 program. For example, Soref supervised studies on racial differences in sanctions in the program and on a screening tool used to find barriers for screening for disabilities among W-2 participants. In addition, he analyzed contracts for the W-2 program, maintained computer-generated reports that were used for W-2 contract

10

agency performance standards, fulfilled ad hoc requests of agencies and produced new or modified reports to be used to monitor agency performance.   Soref was responsible for performance planning, performance measurement, evaluation, reporting, statistical reporting and program performance policy.  Soref supervised program design work products and supervised a major change in the data reporting subsequent to reauthorization of Temporary Assistance for Needy Families, or TANF, the federal program that W-2 is under.   Soref and his staff also managed a grant that the Secretary directed to the University's Institute for Research on Poverty, which entailed writing specifications for the project design and then managing the grant.

Another program on which Soref worked was the Child Care Subsidy Program.  Both W-2 and the Child Care Subsidy Program were high-profile, "hot button" programs that received intense public scrutiny and frequently were the subject of requests by legislators, the governor, the department secretary and others for data and analyses that had to be developed quickly, then articulated clearly and understandably.   For example, legislators interested in the W-2 program made detailed requests for both data and analyses about the progress of the program statewide and in their districts and Soref was expected to respond quickly to those inquiries.

Secretary Gassman directly contacted Soref through email and in person to discuss the W-2 program.  On one occasion, Soref helped her prepare for a legislative hearing at which she spoke about the program.

The decision to hire Soref was made by William Clingan, the division administrator, and Sandra Breitborde, the bureau director.  They determined that Soref possessed the skills needed for the position, including the ability quickly to gather and produce data, analyze it, then clearly communicate the data and analysis to people unfamiliar with the technicalities of the W-2

program.  In determining how much to offer Soref, Clingan and Breitborde consulted human resources personnel and considered Soref's curriculum vitae.  Further, due to policies from the governor's office that minimized the chance of significant future compensation increases for executive branch employees, Clingan's  practice was to maximize the initial offers to personnel whom he sought to hire, male or female, in order to obtain and retain qualified employees. Clingan applied this practice when he offered Soref a $62,483 salary.

Soref left the Department effective June 21, 2008, as a result of his position having been reallocated to a different state agency.  He currently is employed as a Research Administrator for the Department of Children and Families, Division of Family and Economic Security, Bureau of Working Families.

## IV.  Nelse Grundvig

A. Nelse Grundvig was hired on June 1, 2010 to fill the position formerly held by Schultz. The Department offered Grundvig a starting salary of $74,000 per year, or $35.58 per hour, about $8,000 more a year than Schultz had been making when she resigned.   During negotiations, the Department eventually increased its offer to $78,000 to match the salary Grundvig was earning in North Carolina.

OPINION

**I.  Legal Overview**

The Equal Pay Act, a subsection of the Fair Labor Standards Act, provides that an employer shall not discriminate

> . . . between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (I) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex  . . . .

29 U.S.C.A. § 206(d)(1).

To prove a violation of the Equal Pay Act, Schultz first must establish a prima facie case of unequal pay by showing that: 1) higher wages were paid to a male employee; 2)she and the male employee performed equal work requiring equal skill, effort, and responsibility; and 3) the work was performed under similar working conditions.  *Cullen v. Indiana Univ. Board of Trustees*, 338 F.3d 693, 698 (7th Cir. 2003).  If Schultz meets this burden, then the burden shifts to the Department to show that the pay disparity was justified in one of four ways:  1) a seniority system; 2) a merit system; 3) a system which measures earnings by quantity or quality of production; or 4) any factor other than sex.  *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 793-94 (7th Cir. 2007); *Fallon v. Illinois*, 882 F.2d 1206, 1211 (7th Cir. 1989).

Summary judgment is proper where there is no showing of a genuine issue of material fact in the pleadings, depositions, answers to interrogatories, admissions and affidavits, and where the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "A genuine

issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party.'" *Sides v. City of Champaign*, 496 F.3d 820, 826 (7th Cir. 2007) (quoting *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005)).  In determining whether a genuine issue of material facts exists, the court must construe all facts in favor of the nonmoving party.  *Squibb v. Memorial Medical Center*, 497 F.3d 775, 780 (7th Cir. 2007).  Even so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## II.  Ludeman and Saeman

Under 29 U.S.C. § 255(a), any action under the Equal Pay Act must be brought within 2 years of the injury alleged, or within 3 years if the defendant's conduct is willful.  In *Snider v. Belvidere Township*, 216 F.3d 616, 618 (7th Cir. 2000), the court held that in discrimination cases based on unequal pay, the statute of limitations starts to run

> when the [higher-paid] male leaves his employment. This is because the male's departure ends the allegedly discriminatory wage differential (assuming there are no other men being paid more than the plaintiff for a job requiring equal skill, effort and responsibility).

Applying this rule to the facts before it, the court found that to state a timely EPA claim based on the greater earnings of her former coworker, (a man named Witek), the plaintiff had to have "filed her cause complaining of Witek's wage no later than June 30, 1998 (two years after Witek left the Assessor's office)."  *Id*. at 619.  Because the court could find nothing in plaintiff's

14

complaint suggesting that she was bringing an EPA claim based on Witek's wages and the two-year period had long passed, it did not consider the evidence of Witek's wages.  *Id.*

Relying on *Snider*, the Department contends that Schultz cannot point to Ludeman or Saeman to prove her claim of wage discrimination because both of them left the Department more than 3 years before plaintiff filed her suit.  Schultz does not contest the timeline but responds with three arguments why *Snider* does not control.  None is persuasive.

First, Schultz characterizes as dicta *Snider*'s declaration that males whose employment terminated more than two years (or in the case of willfulness, three years) before the plaintiff filed her EPA suit cannot be used as comparators.  A plain reading of the case, however, indicates that this is not so.  The court's determination that plaintiff could not bring an EPA claim based on Witek's wages flowed from its affirmation of the precedent set in *Dasgupta v. University of Wisconsin Board of Regents*, 121 F.3d 1138 (7th Cir. 1997), which held that "the continued receipt of lower paychecks does not revive past allegedly discriminatory conduct."  *Snider*, 216 F.3d at 618 (citing *Dasgupta*, 121 F.3d at 1139-40).  In other words, the court's conclusion that the plaintiff could not submit proof of Witek's wages because it was outside the relevant time period was not merely a peripheral remark or observation, but was necessary to the outcome of the case. *See United States v. Crawley*, 837 F.2d 291, 292-93 (7th Cir. 1988) (defining dicta).  Accordingly, *Snider* is binding on this court.

Second, Schultz seizes on the language quoted in parentheses above and uses it to argue that she should be allowed to use Ludeman and Saeman as comparators because even after they left the department, there still were male Research Administrators who made more than she did. Again, however, Schultz misreads *Snider*.  Contrary to her assertion, the court did not "qualify"

its opinion, it merely stated the obvious:  wage discrimination does not end with the departure of one higher-paid male if other higher-paid males remain employed.  Plaintiff may be able to proceed with her wage discrimination claim on the basis of the higher-paid males who were employed within two or three years of when she filed her suit, but the fact that she has some comparators who were employed by defendant during the limitations period does not mean she can bring in those who were not.

Finally, Schultz points out that according to the EEOC's interpretive regulations, "[i]t is immaterial that a member of the higher paid sex ceased to be employed prior to the period covered by the statute of limitations for filing a timely suit under the EPA."  29 C.F.R. § 1620.13(b)(5)(1987).  Although the court of appeals did not mention this regulation in *Snider*, the court cited with approval the Sixth Circuit's decision in *EEOC v. Penton Industrial Publishing Co.*, 851 F.2d 835, 838-39 (6th Cir. 1988).  In that case, the court determined that 29 C.F.R. § 1620.13(b)(5) is "limited in application to cases where the aggrieved party who initiated the discrimination charge was either the predecessor or successor of the more highly paid employee." *Id*. at n.8.  In this case, Schultz was not the predecessor or successor of Ludeman or Saeman.

In sum, based on *Snider* and *Penton*, I find that plaintiff may not attempt to establish an EPA violation with evidence of Ludeman's and Saeman's wages.


## III.  Winters and Soref

There is no dispute that Winters and Soref both earned more than Schultz at the Department and that they all worked under similar conditions.  The parties' dispute with respect

16

to Winters and Soref centers on whether they and Schultz performed work requiring equal skill, effort and responsibility.

For Schultz to satisfy this element of her prima facie burden, she must show that her job and those performed by Winters and Soref had a "common core of tasks," which means that a significant portion of the two jobs must be identical. *Cullen*, 338 F.3d at 698 (internal quotation marks omitted). If a plaintiff establishes this "common core," then the question becomes whether any additional tasks make the jobs "substantially different." *Id*. When assessing job duties, each of the elements listed in the EPA (skill, effort and responsibilities) must be met individually to establish a prima facie case. *Id*.; *see also* 29 C.F.R. § 1620.14. The parties agree that in making this job comparison, the factfinder must examine the duties actually performed by each employee, not merely job descriptions, classifications or titles. *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 695 (7th Cir. 2006); *Fallon*, 882 F.2d at 1208.

As Schultz concedes, the separate sections that she, Winters and Soref headed were heterogenous, with each performing different work and managing different programs. In the face of this concession, Schultz faces a formidable burden in showing that she was performing work equal in skill, effort and responsibility to that performed by Winters and Soref. The Seventh Circuit has made quite clear that equal pay is not to be confused with equal worth:

> [W]hen jobs are heterogeneous a suit under the Equal Pay Act is in danger of being transmogrified into a suit seeking comparable pay--a theory of liability for sex discrimination under Title VII that has been rejected by this and the other courts to consider it . . .
>
> *   *   *
>
> The proper domain of the Equal Pay Act consists of standardized jobs in which a man is paid significantly more than a woman (or anything more, if the jobs are truly identical) and there are no skill differences. An example might be two sixth-grade music teachers,

17

having the same credentials and experience, teaching classes of roughly the same size in roughly comparable public schools in the same school district.

*Sims-Fingers v. City of Indianapolis*, 493 F.3d 768, 771 (7th Cir. 2007).

The jobs being compared must be not merely comparable, but must be "substantially alike." *Equal Employment Opportunity Commission v. Madison Community Unit School Dist. No. 12*, 818 F.2d 577, 582 (7th Cir. 1987). Thus, in *Sims-Fingers*, the court found that the plaintiff, a female manager of a city park in Indianapolis, had failed to make a prima facie case under the EPA where the male park managers to whom she compared herself managed larger parks with more facilities or greater income and patronage than plaintiff's small park. *Id*.

According to Schultz, the only difference between her job and that of her comparators was the entities or programs with which they worked, a difference she contends is insubstantial. As proof, she relies on her own affidavit, in which she avers that she performed all of the same tasks that Soref and Winters performed. A careful reading of Schultz's affidavit, however, when compared to the testimony of Soref and Winters and other evidence concerning their responsibilities, establishes that Schultz cannot meet her prima facie burden with respect to the effort and responsibility prongs of the test.[3] Further, Schultz's attempt to downplay the differences in the programs she supervised is unconvincing.

---

[3] Although the Department also argues that Schultz has failed to adduce admissible evidence showing that she meets the "equal skill" prong of the job comparison, I am satisfied from comparing the respective position descriptions that Schultz has met her burden in this regard. In any event, it is unnecessary to dwell on this question because Schultz fails to meet the two other requirements, effort and responsibility.

### a.  Winters

"Responsibility is concerned with the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation."  29 C.F.R. § 1620.17(a). "Effort is concerned with the measurement of the physical or mental exertion needed for the performance of a job."  29 U.S.C. § 1620.16(a).  Thus, job factors that cause mental fatigue and stress are part of the effort inquiry.

Schultz's affidavit shows that as managers of their respective sections, she and Winters performed a number of similar tasks, including personnel management, participation on committees and workgroups and keeping abreast of policy initiatives.  Winters, however, had additional duties that differed significantly in degree of effort and responsibility.  Most importantly, Winters served as the State of Wisconsin's "chief economist."  Schultz did not. Winters held a much more visible role in the Department, frequently making public announcements and speaking to the media regarding labor market and other economic information and analyses performed by his staff of labor market analysts around the state. Although Schultz avers that, like Winters, she "explained policy to the public and disseminated Department information" on an as-needed basis, nothing in the record suggests that this was an ordinary part of her day-to-day activities, as it was for Winters.  The mere fact that her replacement, Grundvig, was scheduled to hold a public address in September does not show that making public announcements was a regular part of Schultz's ordinary duties when she held the post.

Additionally, although Schultz has averred generally that she and her staff did not merely collect data but analyzed it as well, there is no evidence that Schultz or her staff engaged in the

19

same level of economic analysis as Winters and his staff.  The undisputed evidence establishes that Winters and his staff took the wage data gathered by Schultz's section, analyzed it, interpreted it into the current state of economic affairs and then explained those findings to non-economists. Schultz's self-serving and uncorroborated assertion that Winters's group "did no more or less analysis of data than did LMI" is insufficient to establish a genuine dispute whether she and her staff had the same responsibility for the higher-level labor market analyses performed by Winters and his staff.

Further, Schultz's and Winters's positions differed significantly in the degree to which they interacted with and were accountable to the department secretary.  Winters reported directly to Secretary Gassman, communicated with her often and was expected to be available to confer with her on a moment's notice, including nights and weekends.  In contrast, Schultz had little direct contact with Gassman and reported to a bureau director.  Schultz was able to handle her job responsibilities with no disruption even though she left the office at 3:15 p.m. every day to work a second job.  There is no genuine dispute that Winters's job involved greater mental fatigue and stress than Schultz's.  On this record, no reasonable jury could find that Schultz's and Winters's jobs were equal either in terms of effort or responsibility.

Even assuming, *arguendo*, that Schultz has established a prima facie case with respect to Winters, the burden would shift to the Department to establish one of four statutory defenses. *Cullen*, 338 F.3d at 702.  The statutory defenses occur when the rate of pay is determined "pursuant to (I) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any factor other than sex."

29 U.S.C. § 206(d)(1).   The Department relies on the fourth defense, asserting that the difference in pay between Schultz and Winters was based on factors "other than sex."

Specifically, the Department contends that the pay disparity was based on the difference between Schultz's and Winter's education and experience and on market forces.  Winters held a master's degree in economics and authored or coauthored numerous publications pertaining to Wisconsin's economy and workforce development.  He was known to Secretary Gassman as a reputable expert on the Wisconsin economy and for his work at North Star Economics, the private consulting firm that he managed.  Schultz, had a high school diploma and had spent her entire career in the LMI section.  "Under the EPA, differences in education and experience may be considered factors other than sex." *Merillat*, 470 F.3d at 697.  The clear differences between Winter's and Schultz's experience and education were factors other than sex that justified paying higher wages to Winters.

Defendant also contends that Winter's salary was determined by market forces.  It is undisputed that when establishing the pay grade for the chief economist position, the Department looked at what economists in the federal government were paid, which was $89,441.  An employer may take market forces into account when determining the salary of an employee, provided there is no evidence suggesting that the employer took advantage of any kind of market forces that would permit different pay for a male and female for the same position. *Merillat*, 470 F.3d at 697; *Cullen*, 338 F.3d at 703; *Stopka v. Alliance of American Insurers,* 141 F.3d 681, 687 (7th Cir. 1998).  Plaintiff has pointed to no evidence suggesting that the defendant was not motivated by legitimate market forces when it offered a salary to Winters  based on prevailing market rates for government economists.  Because plaintiff has failed to adduce evidence to place the facts

surrounding defendants' stated rationales for the difference in pay in dispute, the Department is entitled to summary judgment on its affirmative defense with respect to Winters.

### b.  Soref

Although Soref's job was more similar to Schultz's than Winters's, nonetheless there are significant differences that preclude Schultz from establishing her prima facie case.  Soref had additional responsibility for tasks that Schultz simply did not perform.  For example, Soref was responsible for conducting original research on the W-2 program and for managing a grant directed to the University's Institute for Research on Poverty.  Nonetheless, Schultz avers that she, too, directed original research, just not on the W-2 program, and that she also managed grants and wrote specifications for projects, just not the same poverty grant that Soref managed. However, Schultz fails to describe specifically or even generally the subjects of the research that she conducted or the grants that she managed.  Absent specific examples, this court has no basis to conclude that her alleged research and grant-management duties involved the same level of effort or responsibility as that performed by Soref with respect to the W-2 program.

Soref's job also differed in terms of effort.  One of Soref's tasks was to supervise program design work products.  In conjunction with this, he supervised a major change in the data reporting for the W-2 program subsequent to reauthorization of TANF.  Although plaintiff alleges that she also "supervised program design work" as part of the state/federal labor market programs she supervised, she does not allege that any of her programs underwent a "major change in data reporting" under her supervision.  In fact, many of the reports and statistics produced by Schultz's group were done so pursuant to stringent guidelines established by the

Bureau of Labor Statistics that varied little over time.  In contrast, the data reporting and analyses performed by Soref were more dynamic, as TANF was first implemented and then reauthorized.  I am satisfied that Soref's task of keeping abreast of the ever-changing reporting requirements for TANF and W-2 required more mental effort than was required of Schultz with respect to her well-established wage programs.

In addition, the programs on which Soref worked, W-2 and the Child Care Subsidy Program, were high profile and of keen political interest to legislators and others both within and outside the government.  Soref communicated with Secretary Gassman about W-2 issues on more than one occasion and once helped her prepare for a legislative hearing on the subject. Although plaintiff makes the conclusory assertion that she also had "'hot button' issues to deal with," such as unemployment and related plant closings and strikes, she does not back up her assertion with any specific evidence concerning how and when she had to "deal with" those issues.  In particular, she makes no claim that such issues were "frequently the subject of repeated requests by legislators . . . and others for data and analyses that had to be developed quickly and articulated clearly and understandably," as was required of Soref's position.  The high-profile nature of the programs with which Soref worked demanded more effort and responsibility.

In sum, although the record reveals similarities, there are enough conceded differences between Soref's and Schultz's positions to preclude Schultz from establishing a prima facie case of wage discrimination.

Further, although it is somewhat of a closer question, I am satisfied that defendant has met its burden of showing that it is entitled to summary judgment on the justification question. As the Department points out, Soref was hired from another department where he was working

23

in a lower-classified position.  Under Wisconsin's civil service laws, his appointment to the Research and Statistics chief position entitled him to a promotion, along with an increase of at least 8% above what he had been making in his previous job.  This policy amounts to a bona-fide, gender neutral explanation for the first eight percent of Soref's salary increase.

Soref's initial salary was 14.4% greater than his prior salary.  The remaining 6.4%  was a discretionary increase obtained by Clingan, who testified that he had a personal practice of attempting to set the initial salaries of his new hires, male or female, at the highest rate possible.  According to the Department, this shows that the disparity between Soref's and Schultz's wages was not based on sex.

Schultz responds that Clingan must not have applied his philosophy to Soref because the starting salary he offered, $62,483, was well below the maximum $76,218 allowed by the pay range.  As the Department points out, however, Clingan testified that the salaries he offered were set within constraints set by Human Resources personnel.  The fact that Soref's salary was below the maximum does not refute Clingan's testimony that he attempted to negotiate a salary for Soref that was as high as possible given HR constraints, and that he did so with his new hires across the board.  Absent evidence that Clingan applied this practice only to males, it suffices as a "factor other than sex" that justifies the wage disparity.


## IV.  Grundvig

This leaves Grundvig, Schultz's successor.  Although the Department concedes that a plaintiff may rely on her successor to establish a violation of the Equal Pay Act, *see, e.g., Patkus*

24

*v. Sangamon-Cass Consortium*, 769 F.2d 1251, 1260 (7th Cir. 1985) (salary paid to successor who performs substantially same work may provide basis for equal pay action), the Department insists that Schultz cannot rely on Grundvig because she did not name him in her complaint or amended complaint. Schultz responded by moving to amend her complaint, asserting that she did not name Grundvig earlier because he was not hired until June 1, 2010, and that she did not learn the details of Grundvig's job duties or compensation until he was deposed on July 29, 2010. The Department ripostes that allowing an amendment at this late juncture not only is unfair but futile.

Assuming without deciding that an Equal Pay Act plaintiff must formally identify all alleged comparators in her complaint, I conclude that Schultz should be allowed to amend her complaint to add Grundvig as a comparator and that allowing her to do so would not be futile.

Let's start with the futility argument: the Department contends that even assuming Grundvig is a proper comparator,[4] Schultz's EPA claim fails as a matter of law because Grundvig's starting pay at the Department equals his prior wages in North Carolina. According to the Department, an employer's decision to pay an employee the wages he was earning at a previous job is a "factor other than sex" that shields the employer from liability under the Equal

---

[4] In a footnote in its reply brief, the Department asserts that "Schultz has failed to present admissible evidence that Grundvig is performing the same duties as Schultz and the record evidence actually points the other way." Dkt. 59, n.4. Schultz averred in her affidavit that, based upon Grundvig's testimony at his deposition about his job duties and his position description, Grundvig is performing the same job that Schultz performed when employed by the Department. Dkt. 56, ¶¶133, 134. The Department does not deny that Grundvig was hired to replace Schultz and it has not pointed to any additional duties that Grundvig has been asked to perform that were not performed by Schultz. On the record as it stands, it appears that Schultz has met her prima facie burden of showing that she and Grundvig performed work requiring substantially equal skill, effort and responsibility. The Department is free, however, to present evidence to the contrary in the event it files an amended summary judgment motion with respect to Grundvig.

Pay Act.  The Department gains strong support for its position from *Wernsing v. Illinois Dept. of Human Services*, 427 F.3d 466 (7th Cir. 2005), in which the court declares in seemingly absolute terms that "prior wages are a 'factor other than sex'" that justifies paying a worker of one sex more than a worker of a different sex for similar work.  *Id*. at 468 (citing *Dey v. Colt Const. & Development Co.*, 28 F.3d 1446, 1462 (7th Cir. 1994), *Riordan v. Kempiners*, 831 F.2d 690 (7th Cir. 1987) and *Covington v. Southern Illinois University*, 816 F.2d 317 (7th Cir. 1987)).  After a close look at *Wernsing* and the cases that preceded it, however, it is not entirely clear whether prior wages alone will *always* justify a wage disparity.

In *Wernsing*, 427 F.3d at 467, the plaintiff was earning less than her male counterpart by virtue of the Department's policy of giving *lateral* entrants a salary at least equal to what they had been earning, plus a raise if possible; the plaintiff's counterpart initially came into the department earning more than the plaintiff did.  Similarly, the University in *Covington*, 816 F.2d at 321, defended the pay disparity in that case by pointing to its policy of retaining the salary of employees who change assignments.  In this case, by contrast, Grundvig was not a lateral hire, nor has the Department alleged that it had a "policy" of matching prior salaries when it made a new hire.  In addition, as Schultz points out, even the Department's initial offer to Grundvig of $74,000 was far more than Schultz had been making in the same position.  The Department has not explained how it arrived at this figure for its initial offer.

*Dey*, 28 F.3d 1446, is the only case among the *Wernsing* progeny that involved an outside hire or any discussion of the employer's initial salary offer.[5]  At the time of her termination, Dey

---

[5] In *Riordan*, 831 F.2d 690, the male employees who earned more than the plaintiff worked in the same state unit as plaintiff, but were federal employees by virtue of a federal-state support agreement. When the plaintiff, a state employee, proposed to reorganize the unit by converting the federal employees

had been making an annual salary of $27,500.  *Id*. at 1461.  Her successor was hired at starting

pay of $32,400, after being initially offered $30,000.  In defense of the pay disparity, the

company cited the male's prior salary and his superior educational background.  In upholding

the trial court's grant of summary judgment to the employer on the plaintiff's EPA claim, the

court explained:

> It also is undisputed that Colt initially offered Maloney
> approximately $30,000, but that he negotiated an annual salary
> closer to what he had been earning at Allnet. It is not surprising
> that Maloney would be unwilling to become Colt's controller unless
> he was compensated at or near his previous rate. Such evidence
> must be considered with some caution, of course, as undue reliance
> on salary history to explain an existing wage disparity may serve to
> perpetuate differentials that ultimately may be linked to sex. *See
> Riordan v. Kempiners*, 831 F.2d 690, 699-700 (7th Cir. 1987);
> *Covington*, 816 F.2d at 322.  Yet when we consider Colt's initial
> offer and the ensuing negotiations in conjunction with Maloney's
> superior educational background and the fact that Colt hired
> Maloney almost a full year after Dey's last pay raise, we are
> convinced that Maloney's higher salary is unrelated to his sex.

> *Id*. at 1462.

Significantly, the court did not end its analysis with the fact that the wages of Dey's

successor matched his prior wages, but also considered his superior educational background.

Another factor refuting any suggestion of wage discrimination was the defendant's initial offer,

which was only $2,500 more than the plaintiff had been earning a full year earlier.  In this case,

however, evidence regarding the Department's initial offer to Grundvig cuts the other way:  it

was approximately $8,000 more than what Schultz had been making, a disparity too great to be

---

to state employees, the federal employees agreed to the plan only if they received wages comparable to
their wages as federal employees, which were higher than the plaintiff's.  The court had little trouble
finding that the initial disparity in the wages of the plaintiff and the former federal employees was not the
result of sex discrimination.  *Id*. at 698-99.

explained by the mere lapse of time, and in fact, which has not been explained by defendant at all.

After reading *Dey* and the other cases cited in *Wernsing,* I am reluctant to read too expansively the court's pronouncement in *Wernsing* that "prior wages are a factor other than sex." Although there is no doubt after *Wernsing* that an employer may take market forces into account in setting the wages of its employees even if it lacks an acceptable business reason for doing so, it remains debatable whether an employee's salary at his prior job alone will *always* be sufficient– no matter what other circumstances exist—to defeat an Equal Pay Act claim by a lesser-paid member of the opposite sex who performs the same work. The parties are free to argue this point in their supplemental submissions on summary judgment.

Even if *Wernsing* means exactly what it says, the Department has not claimed that it always sets pay in accordance with an employee's former salary and it has not explained why its *initial* offer to Grundvig was so much more than Schultz had been making (but less than Grundvig already was making). The state may have evidence relevant to both points, but it has not provided it. "[A]n employer cannot use a gender-neutral factor to avoid liability unless the factor is used and applied in good faith; it was not meant to provide a convenient escape from liability." *Fallon*, 882 F.2d at 1211. On the limited facts in the record, I am not convinced that it would be futile to allow Schultz to amend her complaint to add Grundvig as a comparator.

Having concluded that it would not be futile to allow Schultz to amend her complaint, I turn to the question of prejudice. The equities cut both ways. On the one hand, Schultz could and should have acted more quickly to pin down Grundvig's status as a comparator and she

28

should have amended her complaint after she learned of his hire in early June 2010, knowing the summary judgment deadline was imminent.  On the other hand, she asked for permission to depose Grundvig on July 14, 2010, about a month later, thereby putting the Department on notice that she viewed Grundvig as fair game for her EPA claim.  As for the Department, staking its all on the ground that Grundvig was out for procedural or futility reasons was risky;  a more cautious  course would have been to supplement its summary judgment submissions with more evidence about Grundvig's job duties or the reasons why it initially offered him $74,000.  Nonetheless, I cannot say that the risk the Department took was an unreasonable one, given *Wernsing*'s strong language regarding prior wages, *Snider*'s suggestion that an EPA plaintiff must name her comparators in her complaint and this court's statements in prior orders that the trial date remained firm.

At this juncture, it would be unfair to the Department and a potential waste of judicial resources to deny the motion for summary judgment with respect to Grundvig.  Instead, I will stay any ruling with respect to Grundvig and allow the Department to amend its motion.  In spite of my prior statements and general reluctance to move trial dates, the November 15 trial date will be stricken and then re-set if necessary.

ORDER

IT IS ORDERED THAT:

1.      Plaintiff's motion to amend the amended complaint (dkt. 77) to add Nelse Grundvig as a comparator for purposes of establishing a violation of the Equal Pay Act is GRANTED.

2.      Defendant's motion for summary judgment (dkt. 45) is GRANTED IN PART and STAYED IN PART.  The motion is GRANTED with respect to comparators Terry Ludeman, Paul Saeman, Dennis Winters and Michael Soref.  The motion is STAYED with respect to Nelse Grundvig.

3.      Defendant is granted leave to file an amended motion for summary judgment with respect to Nelse Grundvig.

4.      Defendant's deadline for filing an amended motion for summary judgment is November 5, 2010.  Plaintiff's response is due not later than November 22, 2010.  Defendant's reply is due not later than December 3, 2010.  All submissions must comport with this court's *Procedure to be Followed on Motions for Summary Judgment.*  The parties may rely on and incorporate by reference all documents already filed in this case.

5.      The November 15, 2010 trial date is STRICKEN.  If a trial is necessary after the court rules on defendant's amended motion for summary judgment, the court will promptly set a new date in consultation with the parties.

        Entered this 20th day of October, 2010.

                                BY THE COURT:

                                /s/

                                STEPHEN L. CROCKER
                                Magistrate Judge

30